I'll be happy to call it the last case. Case number 15-1793, Scott Rowan v. Brookdale Sr Living Community. Oral arguments not to exceed 15 minutes per side. Mr. Jules Oseman for Plaintiff Appellant. May it please the Court, Jules Oseman appearing on behalf of Mr. Scott Rowan, who is the power of attorney for his father, Professor George Rowan. The matter before the Court today arises out of a situation in an assisted living facility in Kalamazoo, Michigan, where Professor Rowan, who was a distinguished professor at the College of Agriculture and Community Health Schools at Michigan State University, after some serious health issues, sought the need of a protected environment, or his family did for him rather, to live in, which was the Wynwood facility, which is part of the Brookdale chain. Brookdale is perhaps the largest provider of senior services in the United States. They have over 1,000 facilities. About 108,000 people reside in these facilities. Mr. Rowan is 72. He suffered a serious stroke in December of 2012. He went through a very difficult situation, personal situation with his family. And finally, in the summer of 2013, his first wife decided that it would be best if he went to live in this protected environment. There were significant concerns, both about his physical well-being. You say his first wife. He didn't marry thereafter, did he? No, no. His second wife is the one that was beating him up. It was a terrible familial situation for him. Very difficult situation. So Mr. Rowan goes into the facility on July the 13th with his daughter, and he is presented with a multi-page admission document to sign, which he signs for her. He signs in the presence of the people from Brookdale. And this, of course, includes a rather onerous and significant arbitration agreement. That wasn't the first time he'd gone there. He went there with his wife prior to that, didn't he? That may be the case. The problem in the case is the trial court made a finding that the admission agreement had been given to them at that earlier visit, and I would submit to this court there's no evidence of that. We're just looking for circumstantial evidence, and he was required to sign this form and to give a doctor's certificate. Now, he brought with him the doctor's certificate, already filled out and signed, so he had to have received that in advance to have been able to bring it with him, right? Well, the doctor's certificate merely says it's an appropriate placement. It doesn't speak to mental competence. I got that, but I'm saying he showed up with a doctor's certificate, so he knew he had to have that, and he had been able to have gone to a doctor and have it filled out, regardless of what it says. Well, I don't know that he did that, Your Honor. Somebody did. All right, no question about that. So what? That doctor's certificate merely says this is an appropriate placement. This is not the issue in this case is when Mr. Mr. Oldsman, I'm not asking you anything about what the certificate said. I'm not implying anything. I'm just simply pointing out that this was not the first time this guy had shown up at the nursing home. It's not a nursing home. It's an assisted living home. Assisted living home. He had been there earlier, and the question is whether there is circumstantial evidence that if, because there are normal practices to give the doctor's certificate and the form that you have for the contract, whether that's satisfied in this case. That's the only thing I'm asking you. All I can respond to the Court with that is that my client's daughter did not recall that Mr. Rowan had been furnished the document previously. In other words, if the argument is, well, you had plenty of time to read it, plenty of time to go over it, there's no evidence of that. There's no evidence of that. And what, in fact, happened here is typical. The only evidence might be, as Judge McKeague suggests, is that he knew what to bring that day. Or someone knew what to bring for him. Right. And it was filled out and ready to roll. But the issue, Your Honor, is whether or not this judge, the trial court, Judge Maloney treated this as a summary judgment case under Rule 56. He said, in his opinion, he starts out saying that this honorable court hasn't quite told us how we need to decide these motions to compel arbitration. We filed it in state court. They removed it. The first thing they filed was a motion to compel arbitration. Judge Maloney starts out by saying, well, the Sixth Circuit hasn't told us what to do, so I'm going to treat this as a Rule 56 summary judgment motion. Great. Using your opinion in default, what did he do here? He weighed all the evidence. He decided what was true and what wasn't, or gave inferences, if you will, to the defendant, who was the moving party. I didn't get an inference in the case. I keep looking for the inference that I got. I didn't get an inference in the case. And he says, well, looking at it in total, I think that Mr. Rowan was mentally competent when he signed that document on July 13th. Well, let me pose a couple things to you. There are two doctors whose depositions were taken in this case. Dr. Berry, who was his treating family medicine doctor in Lansing. And Dr. Berry said, I'm offering no opinion on Mr. Rowan's mental capacity on that date. We're looking at it in that window. Could he possibly have understood what he was signing on that day vis-à-vis this arbitration agreement? That's what we're looking at, this narrow little window. Nothing more. Dr. Tadanini, who was the defendant's psychiatrist, they brought him in five days after Mr. Rowan moved in, or four days, rather, on the 17th of July. Now, that should cause somebody to say, well, why are they having a psychiatrist come in to see a gentleman who was just admitted a few days earlier? His role is to decide, well, does he have dementia or delirium? Hello? Hello? At least for the summary judgment motion by the trial court, hello? What are we evaluating here? We're evaluating a person's ability to comprehend the law in Michigan as he has to understand the nature and the act of what he is doing when he signs that arbitration agreement. And I can submit somewhat facetiously when I was preparing myself. Signed up to go to assisted living. Say that again, please. He signed a document to go to assisted living, which included an arbitration agreement. Lots of provisions, one of which was an arbitration provision. Well, not just an arbitration provision, and we don't even need to get into all that here today about the limitations on damages. You only get to call this one. We understand. Right. We don't even need to talk about that here. In terms of all these inferences, there has to be some basis to give you an inference that, in fact, he didn't understand. Well, how about Dr. Tadanini saying... May I finish my question? Yeah, I'm sorry, Your Honor. We are not a jury. I understand. Keep that in mind. I've been warned. Keep that in mind, please. I haven't. So his sister, actually I guess your client's sister, describes her father, who is the man at issue here, saying that she didn't have any reservations about his competency to contract shortly before he signed this agreement. And that's pretty damning evidence. That's one. That's one. The therapist expressed confidence in the ability to comprehend each section of the contract. So we have that as evidence. We're not drawing inferences from that. So from what do you say Judge Maloney should have drawn inferences that he didn't have the ability to contract? Well, the totality of the circumstances, the fact that Dr. Tadanini is brought in just a few days, there is no exam on that day. I can't point to an exam on that day. But their psychiatrist, the defendant's own psychiatrist, comes in a few days later and says, Well, I'm being asked, Well, was he delirious or did he have dementia? And then when he's asked, Do you have an opinion about whether or not Mr. Rowan, Professor Rowan, would have been competent to sign this on the 13th? He says, I have no opinion. I have no opinion on that at all. And you know why he says that? How does no opinion help you? He says that requires testing. There's no testing. There was no testing done by him. But he says for me to make that opinion, offer that opinion, there has to be some testing. You have the burden of proof in connection with this case to show sufficient evidence to get to the jury on the question of whether he was competent. Now, all of the evidence that we have seems to suggest that he was competent. And all I'm trying to do is help you out here by having you direct me to what evidence there was from which it either established or Judge Maloney should have drawn an inference that he wasn't competent. From the fact that in April, when Dr. Berry, his treating physician, was deposed, and he said that in April there were significant, significant cognitive impairments. He had problems speaking. He had problems analyzing words. That's just, you know, it's not in July. It's in April. But, you know, when Judge Maloney, well, I view this as a 56th motion. I realize I have the burden of proof, but for the purpose of summary judgment under Defoe, I don't see how Judge Maloney can... He's weighing the evidence here. He's saying, well, I think this is okay. This is enough. Mr. Olesman, I'm sorry to interrupt. You've done this for a long time. I have. You know what the drill is here. I do. This is a Rule 56, and you have to show a genuine issue of material fact as to the validity of the agreement to arbitrate. So all I'm doing is simply asking you to tell us what is that evidence, because all the evidence that's discussed seems to cut the other way. Well, the most valuable evidence that I have is Dr. Tadanini's testimony, who is the psychiatrist who saw him literally 72 or 96 hours after he signed the agreement, and he says I'm being asked to determine whether this gentleman has dementia or delirium. And the question there is, you know, is he mentally competent? I mean, can he function safely in an assisted living? That's why they bring him in. I mean, anecdotally, that's why they would bring a psychiatrist in, because they want to make sure it's a safe placement for him. This is what we have at this time. The judge said he wanted us to decide and we were only deciding one thing at that time.  limited insight and judgment as a result of either mild vascular dementia or delirium. Are you saying that the conclusion that he did draw, that I've just summarized, was sufficient then to get the issue of competence to a jury? Yes. Yes, it is. It's an inference that I should get here, just like the inference that... Why would you get that inference if he then went on to say that he was not assessing competence? If the diagnosis that he did give is, as you say, a diagnosis that he wasn't competent, or from which you should be able to draw the inference that he was not competent, the doctor wouldn't have said that the evaluation didn't involve competency. No, he said he wasn't going to give an opinion. You know, he's being asked these questions long after the fact, after everything goes bad here, and then the question is, well, did you assess his competency? No. No, I didn't. I'm not telling the court anything. The people who did it, who gave opinions, the family members, said... I don't know that you can... With all due respect, Your Honor, I don't know how a lay person could offer... And then how about using the idea that he signed a PPO and somebody said, well, see, he could sign a PPO in front of a group of lawyers in East Lansing. I mean, is that like... Okay, well, that means he's competent. Who adjudicated that? To conclude this phase, would it be fair to say that your best evidence that he wasn't competent is what Dr. Tattanini says he was suffering from? Correct, plus the totality of his medical condition at that time, plus just looking at everything in a vacuum. I'm not in a vacuum, but looking at it in isolation. As the daughter said, they walk in, they're told, here's the agreement, sign it. And we're in a hurry, we have the next person to go. Thank you. So, thank you. May it please the Court, Ron Letterman on behalf of the defendant, Appellee Brookdale. I believe that Judge McKee hit the nail on the head with narrowing the controlling points for this appeal and for articulating the fact that this was a summary... It was treated as a summary judgment motion. The plaintiff had the burden of proof to establish that Dr. Rowan was not mentally competent at the time he signed the residential agreement. I think that, based upon your questions and comments to Mr. Olsman, the Court is well aware that there is an absence of evidence in the trial record which justified Judge Maloney's grant of summary judgment in favour of the defendant. What do you say about his characterization of what Dr. Tattanini did say? In other words, what he did say in fact demonstrates incompetence, even though Tattanini disclaimed any opinion about competence. Dr. Tattanini did not really add or provide any new facts or diagnosis, except for possibly saying that he suffered... Dr. Rowan suffered from anxiety and depression. Dr. Tattanini... Is that really the question? Yes. Is there any evidence here that somebody that is suffering from anxiety, depression, limited insight and judgment as a result of either mild vascular dementia or delirium, in fact is not competent to sign a document? If somebody went to a medical journal and said, gee, look at the definition of all these things, and in combination, therefore it shows they're not competent, that would be a pretty strong argument on Mr. Olsman's behalf. There's no such evidence here. There's no evidence whatsoever. So is there any medical evidence that's saying that these conditions or combination of conditions show somebody is not competent? No evidence. All right. Zero. I hope that succinctly answers your question. Zero evidence. You got to it. It took a while, but you got to it. Zero evidence. And that's why Judge Maloney granted summary judgment in favor of the defendant. I think that Plaintiff's Counsel misstates or doesn't acknowledge the controlling points that were made by Dr. Berry. Dr. Berry, as you noted, Judge McKee, indicated that notwithstanding the existence of a short-term memory loss, he had no concerns whatsoever regarding any possible mental health issues for Dr. Rowan. Dr. Berry said that he was likely, that Dr. Rowan was likely to comprehend, quote-unquote, each section of the residence agreement. So these two medical witnesses provided evidence that supported mental competency. They provided zero evidence that would support the plaintiff's position. I didn't see anywhere in the record how long it had been since this gentleman had been in the business of being a professor. Is he long? Was it a long time since he taught? Are you referring to? He's a retired professor. Are you referring to the plaintiff? Yeah. Or to the doctor, or to Dr. Berry? No, sir. I thought we understood we had a former professor. Yes. Okay. Yes. How long was it that he was away from professoring? Oh, I can't answer that off the top of my head. All right. I just asked if it were in the record. I would defer. I mean, that goes somewhat to we at least know that we're dealing with an intelligent individual. Yes. Ph.D., I take it. Yes, Ph.D., intelligent individual, former professor, but I cannot tell you. Right. If it's not in the record, I don't need to know. Thank you. I cannot tell you that. I guess to summarize our argument on mental competency, I think that plaintiff's counsel misstates what the trial court did. The trial court did not play fact finder. The trial court did not play jury. The trial court simply noted that there was no evidence in the record to support the plaintiff's burden of proof. It was the plaintiff that had that burden of proof to establish mental incompetency. Well, he had the burden of coming forward with evidence for ruling. The burden of production, yes. There you go. He had the burden of production for purposes of this motion, and the plaintiff didn't satisfy that burden of production. Nothing in his written brief before this Court and nothing in his presentation today gives any credence to his conclusory position. All right. I would also note that as to the public policy arguments, just two points, if I may. Number one, the plaintiff's arguments that the arbitration provision is against Michigan public policy and particularly in violation of Michigan's Truth in Lending Act are not properly preserved for appellate review. The plaintiff did not cite to the Truth in Lending Act in the trial court. The plaintiff instead argued to the trial court that this arbitration agreement was against a very broad public policy set forth by Michigan nursing home statutes to protect against elder abuse. The plaintiff seems to have abandoned those arguments and now has added new arguments on appeal regarding public policy that were not presented to the trial court. In addition, we relied upon in our appeal brief the Marmot Health v. Brown U.S. Supreme Court case, which specifically addresses the federal preemption of the Federal Arbitration Act as against state statutes which might try to limit the availability of arbitration. The Marmot case is right on point. That case, in fact, dealt with state nursing home statutes. It's right dead nuts on point with respect to federal preemption. The damage cap issue, the contractual damage cap issue, was not presented to trial court. In any event, we think that that issue is not appropriately ripe for appellate review. I think that to the extent that it becomes relevant, that is a decision that has to be made by the arbitrator and not by the Sixth Circuit for the first time. It's been postponed? Arbitration proceedings have not been stayed. They have not been stayed. There's discovery that's ongoing. Thank you. Any other questions? Apparently not. Thank you. Just a very brief rebuttal. Judge Maloney said that the issue is premature with regard to the damage cap. He already ruled on that. Okay. Let me just leave you with two things in terms of substantive testimony. Dr. Berry, when he was deposed, his deposition is part of the record before the court, before Judge Maloney and before Your Honors. He was asked for his observations of him in April. I don't mean to read to the court. I just want to quote this. He said that he was unable to report the date, that he had some difficulties with immediate recall, spelling words backwards, and limitations in delayed verbal recall. And to use Your Honors' character, this is a distinguished professor from Michigan State. He's a published author. I mean, this is a very hard thing for a family like this to have to go through. And so when you say, well, he's a very intelligent person, then that would be the next question. And why would he ever in the world sign an arbitration agreement like that? I would take it one step further as an inference. And then with respect to Dr. Berry. Apparently 108,000 people in the country have signed it. Well, don't count on that, Your Honor. But I can tell you Brookdale would like that, though. You can count on that. The section of Dr. Berry's testimony that Judge Maloney quotes on page 11 or refers to on page 11 of the opinion says, Dr. Berry testified that Rowan would likely have been able to comprehend each section of the residency agreement, but he had doubts that Rowan would be able to recall the entire document. Is that a fair characterization of Dr. Berry's testimony? That's what he said. That's what he said. Yes, it is. But then he also said when he was said, fair to say that you are not in a position to offer any opinion as to Mr. Rowan's mental status in July of 2013 other than based on your April visit. So when you look at those two things together, understand I'm just looking. So what evidence is there in the record that you were relying upon that said apparently his condition had changed since April of 2013 to the day that he showed up and signed the agreement? Four days later that the physician at Wynwood over in Portage wanted a psychiatrist. I'm not asking what happened later. I understand your basis of that argument. My question is what was in the record that showed what happened between the April brain therapy and the day he showed up at the facility and signed the document? Are you asking in terms of a medical event or something like that? Tell me whatever event you think is relevant. I can tell you. In the meantime during that period he signs five documents, legal documents to which he has to be competent, and the family says, well, we think he's competent. So I'm just trying to figure out what are you? I agree. You're making the point that that was back in April and this was in July. So what does the evidence show happened? What does the evidence show happened in the meantime? That's all. He signed those documents for the power of attorney and the divorce and so forth because his second wife was physically abusing him in their home. She was beating him. It was a horrific situation. And that's the only thing that went on. I'm trying to help you out here. I know you're trying to explain away signing the documents. I got that. Forget that. What happened that's in the record that shows his ability to comprehend declined from April to the day he showed up? I can't point to a specific hospitalization or a specific occurrence, but I'm just holding the term inference in abeyance here. If on the 17th of July the physician at Wynwood says, I want a psychiatrist to see him rule out delirium versus dementia, that is a pretty in and of itself just in terms of taking a reasonable inference. Something is going on here. They just didn't call in the psychiatrist because he happened to be driving by and asked me if he'd like to see Mr. Rowan today. He said he only goes there when he's asked specifically to see a patient. So I'm looking for an inference here, and I've got it, and I didn't get it in the trial court. Thank you very much. All right. We have your matter. We'll consider it carefully and get you an opinion in due course, and we can adjourn court. Please. This honorable court is now adjourned.